IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| BETTY ESTENSON, Individually and as Personal Representative of the Estate of Edwin Estenson, deceased, | ) ) ) | No. 71429-5-I |
| | ) | DIVISION ONE |
| Respondent, | ) ) | |
| | ) | |
| v. | ) ) | |
| CATERPILLAR INC., | ) ) | |
| Appellant, | ) ) | |
| | ) | |
| BORG-WARNER MORSE TEC INC, (sued individually and as successor-in-interest to BORG-WARNER CORPORATION); BUCYRUS INTERNATIONAL, INC. f/k/a BUCYRUS-ERIE COMPANY; CERTAINTEED CORPORATION; CNH AMERICA LLC (sued as successor-in-interest to INTERNATIONAL HARVESTER COMPANY); CRANE CO. (sued individually and as successor-in-interest to COCHRANE CORPORATION, CHAPMAN VALVE COMPANY and THE SWARTWOUT COMPANY); CRANE ENVIRONMENTAL, INC. (sued as successor-in-interest to COCHRANE CORPORATION); CROWN CORK & SEAL COMPANY, INC. (sued individually and as successor-in-interest to MUNDET CORK COMPANY); CUMMINS, INC.; DANA COMPANIES | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | UNPUBLISHED OPINION |
| | ) | FILED: September 8, 2015 |

LLC (sued individually and as ）
successor-in-interest to VICTOR ）
GASKET MANUFACTURING ）
COMPANY); FORD MOTOR ）
COMPANY; GARDNER DENVER, INC.;）
GENERAL ELECTRIC COMPANY; ）
GENUINE PARTS COMPANY d/b/a ）
NATIONAL AUTOMOTIVE PARTS ）
ASSOCIATION (a/k/a NAPA); GOULDS ）
PUMPS, INC.; HONEYWELL ）
INTERNATIONAL, INC. (f/k/a ）
ALLIEDSIGNAL, INC., successor -in- ）
interest to THE BENDIX ）
CORPORATION); INDUSTRIAL ）
HOLDINGS CORPORATION f/k/a THE ）
CARBORUNDUM COMPANY; ）
ITT CORPORATION, f/k/a ITT ）
INDUSTRIES, INC.; J.T. THORPE & ）
SON, INC.; KEENAN PROPERTIES, ）
INC.; METROPOLITAN LIFE ）
INSURANCE COMPANY; PROBUILD, ）
LLC; RT VANDERBILT COMPANY, ）
INC. (sued individually and as ）
successor-in-interest to ）
INTERNATIONAL TALC COMPANY); ）
and SABERHAGEN HOLDINGS, INC. ）
(sued individually and as successor-in- ）
interest to TACOMA ASBESTOS ）
COMPANY and THE BROWER ）
COMPANY), ）
                                                            ）
_____Defendants.____ ）

SCHINDLER, J. — Edwin Estenson died of mesothelioma caused by asbestos exposure. The Estate of Edwin Estenson filed a lawsuit against Caterpillar Inc. and other manufacturers of asbestos-containing products alleging product liability, failure to warn, and negligence. Following a four-week trial, the jury found in favor of the Estate on all claims against Caterpillar. The court entered a judgment on the jury verdict for approximately $4.5 million. Caterpillar appeals denial of the motion for summary judgment, the motion for a new trial, and the motion to vacate the verdict. We affirm.

2

FACTS

Edwin Estenson served in the United States Navy from 1948 to 1952. While serving in the Navy, Estenson worked for three months aboard the USS Curtiss on repairs working with asbestos-containing pipe insulation. In 1955, Estenson took a job at Morrison Knudsen Construction Company in Montana. Estenson worked as a "heavy-duty mechanic" doing maintenance on equipment including a Caterpillar D8 bulldozer. During the summer of 1959 and 1960, Estenson worked for utility contractor Robertson Caves repairing a Caterpillar D8 bulldozer and a Caterpillar D9 bulldozer. From 1961 to 1968, Estenson worked as a shop foreman at Glasgow Air Force Base. Estenson was responsible for overseeing the maintenance on equipment including two Caterpillar D6 bulldozers, a Caterpillar D7 bulldozer, and a Caterpillar motor grader. In 1967, Estenson performed maintenance on a Caterpillar D7 while working for private contractor Farason Construction in Montana.

In September 2010, Estenson was diagnosed with diffuse malignant mesothelioma. On July 26, 2011, Estenson and his spouse Betty Estenson filed a personal injury lawsuit against Caterpillar Inc. and a number of other manufacturers of asbestos-containing products including Bucyrus International Inc.; CertainTeed Corporation; CNH America LLC, the successor in interest to International Harvester Company; Crane Co., the successor in interest to Cochrane Corporation, Chapman Valve Company, and The Swartwout Company; and Cummins Inc. The lawsuit alleged product liability, failure to warn, and negligence claims.

On June 9, 2011, the parties took a videotaped perpetuation deposition of Estenson. Over the course of approximately 15 days in June and October 2011, the defendants also took the deposition of Estenson.

Estenson died of mesothelioma on February 11, 2012. Betty Estenson individually and as personal representative of the Estate filed an amended complaint alleging wrongful death. Before trial, Caterpillar filed a motion for summary judgment dismissal. The court denied the motion.

The jury trial against defendants Crane Co., Caterpillar Inc., CertainTeed Corporation, and CNH America LLC began on April 18, 2013. At the beginning of the Estate's opening statement, the court informed the jury that manufacturer Crane Co. "settled with the plaintiffs. So [Crane Co.] won't be participating any further in the case." CNH America and CertainTeed later settled with the Estate during the Estate's case in chief. CNH America settled on April 23 and CertainTeed settled on May 6, leaving Caterpillar as the only remaining defendant.

Caterpillar corporate representative Robert Niemeier testified that Caterpillar began selling equipment that contained asbestos parts in the late 1920s and continued to sell asbestos-containing equipment and parts until April 1990. During the time that Caterpillar sold asbestos-containing equipment, 13,000 Caterpillar part numbers corresponded to asbestos-containing components. Niemeier testified Caterpillar sold asbestos gaskets, brakes, and clutches as part of its original equipment and as replacement parts.

> Q We talked about the asbestos products that Caterpillar sold as part of the original equipment and as replacement parts and they included gaskets as we discussed, correct?
> A Yes.

4

Q     And brakes?
A     Yes.
Q     And clutches?
A     Yes.

Niemeier stated Caterpillar's business model was to sell Caterpillar replacement parts to replace the parts that wore out in the Caterpillar equipment:

Q     . . . . It was Caterpillar's business model to sell genuine Caterpillar replacement parts for those wearing parts in original equipment, correct?
A     That was our hope, that our customers would buy our genuine parts.
Q     And you promoted that sales model?
A     The dealers certainly did to their customers, yes.

According to Niemeier, "less than a third" of the "dozens" of gaskets in a Caterpillar D8 bulldozer from the period Estenson worked on Caterpillar equipment contained asbestos. But Niemeier admitted the head gasket Estenson removed from the starter motor of the Caterpillar D8 at Robertson Caves contained asbestos.

Q     And my question is for the gaskets at issue on the equipment [Estenson] worked on, must the gaskets at any time have been asbestos-containing in order to function properly?
A     There were some gaskets that were listed as asbestos-containing that had no other materials called out.
Q     Which ones were they?
A     The one I recall is the head gasket on the gasoline starting engine for the D-8 machine [Estenson] talked about at Robertson Cave [sic] Construction.

The Estate played the videotaped perpetuation deposition of Estenson to the jury. The Estate then presented designated excerpts from the discovery deposition as well as the defendants' designated excerpts.

In the perpetuation deposition and the excerpts, Estenson describes his 13-year work history and his work on and around asbestos-containing products including products manufactured by Caterpillar.

5

Estenson testified that an asbestos-containing gasket disintegrated while he was working on a Caterpillar D8 bulldozer at Morrison Knudsen, and that he breathed the dust from the gasket. Estenson also testified that while adjusting the clutch in the Caterpillar D8 bulldozer, he used compressed air to blow out dust and dirt.

Estenson testified that when he worked for contractor Robertson Caves in 1959 and 1960, he worked on Caterpillar D8 and Caterpillar D9 bulldozers. Estenson said he did "power control unit adjustments on the clutches and brake" of the Caterpillar D9 bulldozer as well as adjusted the track on the Caterpillar D9. Estenson testified that he helped remove the head gasket and carburetor gaskets from the "pony" (starter) motor of the Caterpillar D8. Estenson testified that the replacement parts for the pony motor came from Caterpillar because "Caterpillar was right downtown" and "they're special equipment, and that's the only place you can get [them], is from Caterpillar."

While working as a foreman at Glasgow Air Force Base from 1961 to 1968, Estenson was around others who worked on gaskets for two Caterpillar D6 bulldozers, a Caterpillar D7 bulldozer, and a Caterpillar motor grader. Estenson testified that the replacement gasket for the older Caterpillar D6 came from Caterpillar because "it's highly specialized equipment, and there was a local Caterpillar dealer."

The Estate's medical expert Dr. Eugene Mark testified Estenson died of diffuse malignant mesothelioma caused by exposure to asbestos. Dr. Mark testified Estenson experienced both firsthand and bystander exposure to asbestos from his work on and around Caterpillar equipment and products. Dr. Mark estimated the duration of Estenson's firsthand exposure to asbestos from Caterpillar equipment to be about one year. Dr. Mark testified that in his opinion, Estenson's exposure to Caterpillar

6

equipment and products was "significant in causing the development of his mesothelioma." Based on Estenson's testimony regarding his work with Caterpillar gaskets, Dr. Mark testified that Estenson's exposure to Caterpillar gaskets alone was a substantial factor in causing his mesothelioma.

Caterpillar presented the testimony of United States Navy Commander Thomas McCaffery, certified industrial hygienist Dr. William Krebs, and Dr. Michael Graham.

Commander McCaffery testified that the pipe insulation used on the USS Curtiss during the period of time Estenson worked on the overhaul consisted of a molded asbestos product called "Unibestos." Commander McCaffery testified that "Unibestos contained between 60 and 65 percent amosite asbestos."

Industrial hygienist Dr. Krebs testified that in his opinion, Estenson "did not have a significant exposure to asbestos materials while working on Caterpillar equipment."

Caterpillar's medical expert Dr. Graham testified Estenson died of mesothelioma caused by asbestos exposure. But in his opinion, the cause was from exposure to asbestos "primarily when [Estenson] was in the Navy and primarily during the refitting of the ship," and exposure to Caterpillar products did not cause or contribute to the disease.

The jury found Caterpillar liable for product liability and inadequate warnings. The jury found that the "unsafe condition of the product" was "a proximate cause of injury or damage to the plaintiff." The jury also found Caterpillar negligent and that its negligence was a proximate cause of injury. The jury awarded the Estate $331,928 for Estenson's economic damages and $3 million for pain and suffering. The jury awarded Betty Estenson $2 million for loss of consortium and each of Estenson's four children

7

$175,000 in noneconomic damages. After offsetting settlement amounts of approximately $1.5 million, the court entered a judgment against Caterpillar of approximately $4.5 million. The trial court denied Caterpillar's motion for a new trial and motion to vacate the verdict.

## ANALYSIS

Caterpillar appeals denial of the motion for summary judgment, the motion for a new trial, and the motion to vacate the verdict. Caterpillar seeks reversal of the order denying summary judgment or remand for a new trial.

### Denial of Motion for Summary Judgment

Caterpillar argues the court erred in denying the motion for summary judgment. The Estate contends Caterpillar cannot appeal the trial court's denial of summary judgment because there were material issues of fact. We will not review an order denying summary judgment based on material disputed facts after a trial on the merits. 224 Westlake, LLC v. Engstrom Props., LLC, 169 Wn. App. 700, 715, 281 P.3d 693 (2012) ("When an order denying summary judgment is based on the presence of material, disputed facts, it 'will not be reviewed when raised after a trial on the merits.' ") (quoting Johnson v. Rothstein, 52 Wn. App. 303, 306, 759 P.2d 471 (1988)). But here, Caterpillar claims the court erred in denying the motion for summary judgment as a matter of law because the Estate presented no evidence (1) that Estenson was exposed to an airborne asbestos product manufactured, sold, or distributed by Caterpillar or (2) that any exposure to a Caterpillar product was a substantial factor in causing his mesothelioma. The record does not support Caterpillar's argument.

We review summary judgment de novo and engage in the same inquiry as the trial court. Soproni v. Polygon Apartment Partners, 137 Wn.2d 319, 324-25, 971 P.2d 500 (1999). We must consider the facts and reasonable inferences in a light most favorable to the nonmoving party. Michak v. Transnation Title Ins. Co., 148 Wn.2d 788, 794, 64 P.3d 22 (2003). The nonmoving party must set forth specific facts establishing a genuine issue for trial. Young v. Key Pharm., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). Summary judgment is appropriate if in viewing all of the evidence, reasonable persons could reach only one conclusion. Hansen v. Friend, 118 Wn.2d 476, 485, 824 P.2d 483 (1992). In opposition to Caterpillar's motion for summary judgment, the Estate submitted the testimony of Caterpillar corporate representative Eugene Sweeny, excerpts from the deposition of Estenson, and a declaration from pathologist Dr. Eugene Mark.

It is well settled that an asbestos plaintiff may establish exposure to a defendant's product through direct or circumstantial evidence. Allen v. Asbestos Corp., 138 Wn. App. 564, 571, 157 P.3d 406 (2007); Lockwood v. A C & S, Inc., 109 Wn.2d 235, 246-47, 744 P.2d 605 (1987)). " '[I]nstead of personally identifying the manufacturers of asbestos products to which he was exposed, a plaintiff may rely on the testimony of witnesses who identify manufacturers of asbestos products which were then present at his workplace.' " Morgan v. Aurora Pump Co., 159 Wn. App. 724, 729, 248 P.3d 1052 (2011)[1] (quoting Lockwood, 109 Wn.2d. at 246-47). A plaintiff need not offer a detailed recollection of facts surrounding the exposure to the asbestos-containing product. Morgan, 159 Wn. App. at 729; see Van Hout v. Celotex Corp., 121 Wn.2d 697, 706-07, 853 P.2d 908 (1993); Lockwood, 109 Wn.2d at 246. It is also

---

[1] Alteration in original.

equally well settled that the plaintiff in a product liability or negligence action bears the burden of establishing a causal connection between the injury, the product, and the manufacturer of that product. RCW 7.72.030; Iwai v. State, 129 Wn.2d 84, 96, 915 P.2d 1089 (1996); Lockwood, 109 Wn.2d at 245.

Washington law does not require an asbestos plaintiff to provide evidence that the individual inhaled airborne respirable asbestos fibers from the defendant's product. Instead, Estenson must show "exposure" to an asbestos-containing product manufactured, sold, or supplied by Caterpillar.

In Lockwood, the worker did not introduce evidence that he directly handled the defendant's asbestos products. Nonetheless, the court held that the worker established a prima facie case against the manufacturer of asbestos cloth "by presenting evidence that exposure to asbestos causes asbestosis; that once asbestos dust is released, it can remain in the air and drift with air currents for a long period of time; and that [defendant's asbestos] product was located at shipyards where [the worker] was employed during the period when he worked there." Lockwood, 109 Wn.2d at 239, 243; see also Berry v. Crown Cork & Seal Co., 103 Wn. App. 312, 324, 14 P.3d 789 (2000) (noting the "critical issue for purposes of summary judgment was whether the plaintiffs raised an issue of material fact as to whether [the plaintiff] was exposed" to the defendant's asbestos-containing product).

In Lockwood, the Washington Supreme Court identifies several factors to consider in determining the sufficiency of evidence against a particular manufacturer: (1) plaintiff's proximity to the asbestos product when the exposure occurred; (2) the expanse of the work site where asbestos fibers were released; (3) the extent of time

plaintiff was exposed to the product; (4) what types of asbestos products the plaintiff was exposed to, including the tendency of such products to release asbestos fibers into the air; (5) how the plaintiff handled and used those products; (6) expert testimony on the effects of inhalation of asbestos on human health in general and the plaintiff in particular; and (7) evidence of other substances that could have contributed to the plaintiff's disease and expert testimony as to the combined effect of exposure to all possible sources of the disease. Lockwood, 109 Wn.2d at 248-49.

### (1) Exposure Evidence

Caterpillar argues the Estate presented no evidence that Estenson was exposed to asbestos-containing component parts manufactured, supplied, sold, or distributed by Caterpillar. Caterpillar also claims the Estate did not present any evidence that Estenson was exposed to airborne asbestos fibers from a Caterpillar product. We disagree. Viewing the evidence in the light most favorable to Estenson, the court did not err in concluding there were material issues of fact concerning Estenson's exposure to asbestos-containing products manufactured, sold, or distributed by Caterpillar.

Corporate representative Eugene Sweeny had testified on behalf of Caterpillar "in the neighborhood of 150, 160 times" regarding "[p]roduct liability issues of all sorts." Sweeny testified Caterpillar used asbestos-containing components in its products until late 1990. Sweeny testified Caterpillar used "gasket material and friction products which were available from the marketplace, and many of those contained asbestos."[2] Sweeney states the decision to use asbestos-containing components in those products was "[n]ot by Caterpillar's choice, but by the manufacturer's choice of those

_____

[2] Emphasis added.

11

components. Those are the only really two areas — those are the only two areas where we utilized asbestos in our product."

Sweeny testified that "during the '60s and '70s and into the early '80s," Caterpillar diesel engines contained asbestos gaskets "[i]n some cases." Sweeney said Caterpillar used asbestos-containing gaskets in its diesel engines in areas where high pressure or high temperatures were required to be sealed:

> Q. Okay. Generally speaking, can you tell me the areas where you would expect to find an asbestos-containing gasket on a Caterpillar diesel engine?
> A. Generally in those areas where you have high pressure or high temperatures required to be sealed.
> Q. Okay. I'm not an engine mechanic, and I'm not an engine engineer, so can you tell me what those types of areas would be?
> A. For example, when you're sealing the combustion chamber from the outside world, that's a head gasket. That's typically asbestos. When you're sealing the exhaust gases as they leave the engine and go to the outside world, that's exhaust manifold. Those are typically asbestos. High temperature connections to the engine with coolant, for instance, would often have an asbestos type gasket. That's the kind that we're speaking of.

Sweeny testified the gaskets were originally placed in engines by Caterpillar. Sweeny also testified that because these types of gaskets were highly engineered, it would likely be necessary to use a Caterpillar replacement gasket to replace successfully a gasket in a Caterpillar diesel engine.

> Q. So in [the case of high temperature, high pressure gaskets], would you expect it more likely than not that the practice would be that if someone is going to replace a manifold gasket on a Caterpillar engine, it would be one that they got from Caterpillar that fit that engine?
> A. Yes, I would definitely expect that.
> Q. And Caterpillar supplied replacement gaskets?
> A. Yes.

Estenson testified that while working for construction contractor Morrison Knudson in 1955, he performed maintenance on a D8 Caterpillar bulldozer and crushing

equipment. Estenson testified the Caterpillar D8 "had never been worked on" before and he "changed out a rod bearing in the D8 [Caterpillar] through a side inspection port." Estenson said the "old gasket had to be scraped off and the surface cleaned of all — any foreign material on the cover plate itself and on the engine side also." Estenson specifically recalled scraping off the old gasket.[3] Estenson testified the gasket "disintegrated" and he breathed the dust in the air. Estenson testified the replacement gasket came from Caterpillar.[4]

Estenson also testified that while working at Morrison Knudsen, he "adjusted the clutch on the [power control] unit" of the Caterpillar D8 bulldozer. Estenson said that adjusting the clutch required him to use compressed air to blow out the dust from the interior.

Estenson testified that while working for contractor Robertson Caves, he worked on Caterpillar D8 and D9 bulldozers. Estenson described "tear[ing] . . . apart" the starting motor on the Caterpillar D8 and removing gaskets from the starting motor. Estenson helped the mechanic scrape off the head gasket and oil pan gaskets.

> Q. After you cleaned the carburetor in the cleaner, did that remove all the gasket material that was on the carburetor?
> A. No. It's — would have to be scraped.
> Q. Okay. Did the mechanic do that?

---

[3] Estenson testified, in pertinent part:

> Q. Who was it that — of the three of you, who was it that actually removed the gasket?
> A. Well, I remember scraping on the — it would come off in pieces, part of it stuck to the engine, part of it stuck to the cover. I remember scraping the cover and probably somebody else was scraping on the engine.

[4] Estenson testified, in pertinent part:

> Q. What's your understanding as to where that replacement gasket came from for the [Caterpillar] D8?
> . . . .
> [A.] From the manufacturer, and there was a local Caterpillar dealer.

13

A. On the carburetor. I helped him take the engine apart, and we were scraping head gaskets and the top of the block itself, pan gaskets and that sort of thing.

Q. Did you have to do this work or did the mechanic do this work?

A. Well, I did — we were doing it together.

. . . .

Q. Where do you recall seeing gaskets on the carburetor?

A. Well, the carburetor's in two halves. And there's a gasket between the two halves and there's a gasket between the carburetor and the engine and —

Q. Any other gaskets on the carburetor?

A. That's all I recall.

Q. Did you disturb any other gaskets on the pony motor while you were working on it?

A. Well, head gaskets, oil pan gaskets. I believe there was some other miscellaneous gaskets there. I can't recall exactly.

Estenson testified the replacement parts came from Caterpillar because "Caterpillar was right downtown" and the parts are "special equipment, and that's the only place you can get [them], is from Caterpillar." Estenson also testified about performing maintenance on the Caterpillar D9 including adjusting the brake and clutches in the power control unit, making track adjustments, and helping a factory representative repair the injection pump.

Estenson testified that as a foreman at Glasgow Air Force Base, he worked around Caterpillar equipment. Estenson was the "head of the heavy equipment section" at the air force base. The air force base had two Caterpillar D6 bulldozers, a Caterpillar D7 bulldozer, and a Caterpillar motor grader. Estenson said he was present while others replaced "leaky gaskets" between the injection pump and engine block and in the cooling system on the older of the two Caterpillar D6 bulldozers. Estenson testified the replacement gasket between the injection pump flange and the engine of the older

Caterpillar D6 came from Caterpillar because "it's highly specialized equipment, and there was a local Caterpillar dealer."

Estenson also testified that while at Farason Construction in Montana, he worked on a Caterpillar RD7 bulldozer that "was in pretty bad shape" and "required a lot of maintenance." Estenson said the "RD7 had oil leaks and water leaks, and [the] gaskets on the water pump" had to be replaced.

Braaten v. Saberhagn Holdings, 165 Wn.2d 373, 198 P.3d 493 (2008), is distinguishable. In Braaten, the Washington State Supreme Court affirmed summary judgment dismissal where the evidence did not show the plaintiff was exposed to asbestos-containing products originally supplied by the defendants and there was no evidence the defendants sold or supplied the asbestos-containing replacement packing or gaskets to which the plaintiff was exposed. Braaten, 165 Wn.2d at 380-81. In Braaten, uncontroverted testimony showed the plaintiff did not work with new pumps and valves; that the plaintiff was not exposed to asbestos when others installed new pumps; and that by the time the plaintiff worked on the defendants' products, it was impossible to tell how many times the original packing and gaskets supplied by the defendants had been replaced with asbestos-containing packing and gaskets supplied by other companies. Braaten, 165 Wn.2d at 381-82, 396-97.

Here, unlike in Braaten, Estenson presented evidence that he was exposed to asbestos-containing products and equipment manufactured, distributed, and sold by Caterpillar. Estenson presented sufficient evidence for a reasonable jury to find he was also exposed to airborne asbestos-containing products manufactured, distributed, or sold by Caterpillar.

### (2) Substantial Factor Causation Evidence

Caterpillar also argues the Estate did not present any evidence that working on and around Caterpillar equipment and parts was a substantial factor in causing Estenson's mesothelioma. Caterpillar asserts no evidence supported Dr. Mark's opinion that exposure to Caterpillar products was a substantial factor in causing Estenson's mesothelioma.

In cases involving multiple exposure to toxic materials, a plaintiff need not prove individual causal responsibility. Instead, the plaintiff can prove causation using a substantial factor test rather than a but-for causation test. Hue v. Farmboy Spray Co., 127 Wn.2d 67, 91, 896 P.2d 682 (1995); Mavroudis v. Pittsburgh-Corning Corp., 86 Wn. App. 22, 32, 935 P.2d 684 (1997).

Dr. Mark is a pathologist at Massachusetts General Hospital in Boston and a professor of pathology at Harvard Medical School. Based on his "education, training and experience," Dr. Mark is "familiar with what asbestos is, the types of asbestos, the disease processes caused by inhalation of asbestos (including asbestosis, lung cancer and mesothelioma), and the pathogenesis of asbestos disease processes." Dr. Mark testified that exposure to asbestos causes mesothelioma. Dr. Mark testified that "[t]here is no known safe level of asbestos exposure. All special exposures to asbestos that occur prior to the development of a diffuse malignant mesothelioma contribute to its pathogenesis." Dr. Mark said that "exposure to . . . asbestos-containing Caterpillar products . . . were a substantial factor in causing Mr. Estenson's diffuse malignant mesothelioma."

In the declaration submitted in opposition to summary judgment, Dr. Mark states that he reviewed Estenson's medical and pathology records as well as 15 volumes of Estenson's deposition testimony regarding Estenson's work with Caterpillar equipment. In his deposition, Estenson describes at length working on and around asbestos-containing Caterpillar equipment and products.

Caterpillar also relies on the statement that "these exposures in aggregate were a substantial factor in causing Mr. Estenson's diffuse malignant mesothelioma" to argue Estenson's work with Caterpillar products was not a substantial factor in causing his mesothelioma. Caterpillar takes the statement out of context and ignores Dr. Mark's opinion that Estenson's exposure to asbestos included "his work with asbestos-containing Caterpillar products." In the declaration submitted in opposition to summary judgment, Dr. Mark states, in pertinent part:

> [I]t is my opinion with a reasonable degree of medical certainty that Mr. Estenson's diffuse malignant mesothelioma was caused by exposure to asbestos. Mr. Estenson's work history and occupational exposures are consistent with asbestos as the cause of his disease. . . . Additionally, Mr. Estenson's exposure to asbestos includes his work with asbestos-containing Caterpillar products. In my opinion, again with a reasonable degree of medical certainty, these exposures in aggregate were a substantial factor in causing Mr. Estenson's diffuse malignant mesothelioma.

Viewing the evidence in the light most favorable to the nonmoving party, the Estate presented sufficient causation evidence to meet the substantial factor causation test and survive summary judgment.

Motion for New Trial

Caterpillar challenges denial of the motion for a new trial. Caterpillar argues the trial court erred in allowing the Estate to introduce untimely excerpts of Estenson's deposition testimony, denying the request to submit additional deposition testimony to the jury, and denying the motion to preclude the Estate's medical expert from testifying that Estenson did brake and clutch work on Caterpillar equipment.

We review denial of a CR 59(a) motion for a new trial for abuse of discretion. Moore v. Smith, 89 Wn.2d 932, 942, 578 P.2d 26 (1978); Sommer v. Dep't of Soc. & Health Servs., 104 Wn. App. 160, 170-71, 15 P.3d 664 (2001). The trial judge, who has seen and heard the witnesses, is in a better position to evaluate whether a new trial is warranted than an appellate court reviewing a cold transcript. State v. Hawkins, 181 Wn.2d 170, 179, 332 P.3d 408 (2014).

Caterpillar contends the court erred in allowing the Estate to present untimely deposition excerpts. The record does not support Caterpillar's argument.

The case scheduling order required the parties to designate the deposition testimony they intended to offer at trial by April 8, 2013. The Estate served designations for the discovery deposition on March 27, 2013. Caterpillar, CNH America, Crane Co., and CertainTeed served their designations and counter-designations on April 8, 2013. The parties agreed the Estate would serve its counter-designations on April 12.

When Crane Co. settled with the Estate at the beginning of trial, the Estate withdrew deposition designations that related specifically to Crane Co. The Estate planned to play the videotaped perpetuation deposition of Estenson on April 22 and

18

then read designated excerpts from the 15-volume discovery deposition. The parties agreed Caterpillar would present designated excerpts at the same time.

> We agreed as parties that instead of doing [Caterpillar's] discovery deposition in their case in chief and our video that we would do it all together. That was at [Caterpillar's] request.

Before presentation of the perpetuation deposition on April 22, Caterpillar objected to introduction of the counter-designations that were made in response to Crane Co. Caterpillar argued the excerpts were untimely as to Caterpillar. The court denied Caterpillar's motion to exclude the testimony as untimely but gave Caterpillar additional time to review and object to the designated excerpts from Estenson's discovery deposition. On April 25, without objection from the Estate, Caterpillar presented additional excerpts from Estenson's deposition that it had not previously designated.

The court did not abuse its discretion in ruling the excerpts the Estate presented were not untimely as to Caterpillar. The trial court has wide discretion over the order and presentation of evidence. ER 611(a); Sanders v. State, 169 Wn.2d 827, 851, 240 P.3d 120 (2010). We review the decision to exclude evidence for an abuse of discretion. Salas v. Hi-Tech Erectors, 168 Wn.2d 664, 668, 230 P.3d 583 (2010). Here, the record shows that the counter-designations the Estate introduced were in response to the designations submitted by all of the defendants and were not specific to Crane

Co.[5]

Caterpillar also argues the trial court erred in allowing the Estate to present confusing and misleading testimony from Estenson's deposition. Caterpillar cites Estenson's testimony about the removal of gaskets on a Cummins Inc. engine and brake and clutch work on a well-drilling machine manufactured by Bucyrus International Inc. Caterpillar asserts the deposition testimony created the misleading impression that Estenson was testifying about removing gaskets from a Caterpillar engine.

When the Estate presented the excerpts of Estenson's deposition on April 22 and April 23, Caterpillar did not object to the excerpts as confusing or misleading. For the first time on May 6, 2013, nearly two weeks after the excerpts from the deposition testimony were read to the jury, Caterpillar claimed the excerpts were confusing and left the jury with a "mistaken and misleading and prejudicial impression that [Estenson] did work on Caterpillar's equipment, but he never did." Caterpillar argued it was entitled to present additional excerpts of Estenson's testimony to the jury "so they understand the context" of the allegedly confusing excerpts that had been read on April 23. The court denied the request to present additional excerpts of Estenson's testimony. The court ruled, in pertinent part:

> I think — if you had a live witness here, he would be here and you would do all the direct, cross, redirect and recross at that time.
> And we don't call them back because in this case, obviously, [Estenson] is dead and the testimony is all in deposition.

---

[5] For the first time on appeal, Caterpillar argues the Estate's counter designations violated the case scheduling order and section 9.5 of the "King County Asbestos Pretrial Style Order" (KCAPSO). Caterpillar argues the trial court erred in admitting the Estate's counter-designated testimony because the Estate did not identify the "plaintiff(s) or defendant(s) against which each identified part of the deposition will be offered" as required by KCAPSO section 9.5(a)(5) and did not file a motion and show good cause for the allegedly untimely new designations as required by KCAPSO section 9.5(c). Caterpillar did not object on these grounds at trial. An appellate court will not consider evidentiary objections unless the objections "have been brought to the attention of the trial court, and that court given an opportunity to rule thereon." Symes v. Teagle, 67 Wn.2d 867, 873, 410 P.2d 594 (1966); see also RAP 2.5(a).

> I think you are certainly free to argue . . . in closing argument that Mr. Estenson — you can tell the jury if you look closely at his testimony you will note you will see he never actually said he worked on this equipment. It was a mish-mash of the way things were done.[6]

In denying the motion for a new trial, the court ruled the testimony was not misleading. The court pointed out that in his perpetuation deposition, Estenson testified about working on the Cummins engines and about the brake and clutch work on the Bucyrus equipment:

> It could have been evidence relating to some other manufacturer who the reason why it's here is to give the jury a better picture of the overall exposure that Mr. Estenson had during his working life, just as we presented evidence to the jury of his exposure in the Navy and various other kinds of exposures that he had to products of defendants who were no longer before the Court because the jury had to have the complete picture of what his exposure was, not just that of the defendants who remained before the Court at that time.
>
> I don't find that the testimony presented to the jury was confusing in light of the entire record when they had the videotape deposition that gave them the overall context and, in fact, explicitly described exactly the same thing that's in the Bucyrus excerpts was described on the videotape, and specifically mentions that it was Bucyrus equipment that they were using at the time.
>
> So I think that, taken as a whole, the record is not confusing, and I'll deny the Motion for New Trial.

The court did not abuse its discretion in ruling that the excerpts from Estenson's deposition were not misleading or in denying the request of Caterpillar to introduce additional excerpts more than 10 days after the presentation of the testimony.

Next, Caterpillar asserts the court erred in denying the motion for a new trial because the trial court erred in allowing Dr. Mark to testify that Estenson's work with Caterpillar brakes was a substantial factor in causing his mesothelioma. We disagree.

---

6 Caterpillar's attorney did not avail himself of this opportunity in closing argument.

"The determination of the admissibility of expert testimony is within the discretion of the trial court and will not be disturbed absent an abuse of discretion." Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wn.2d 654, 683, 15 P.3d 115 (2000). "[I]t is an abuse of discretion for a court to admit expert testimony that lacks an adequate foundation." Weyerhaeuser, 142 Wn.2d at 683-84.

As previously described, Estenson testified he made "power control unit adjustments on the clutches and brake" on the Caterpillar D9 at Robertson Caves. Estenson also testified that he "adjusted the clutch on the [power control] unit" on the Caterpillar D8 at Morrison Knudsen. Dr. Mark considered Estenson's work with Caterpillar brakes and clutches, Estenson's use of compressed air during that work, and Caterpillar documents indicating Caterpillar brakes were 50 percent asbestos by weight. Dr. Mark also took note of the fact that Estenson had "spent a lot of time in the seat of different Caterpillars," and reviewed a Caterpillar document indicating the brakes on Caterpillar track-type or wheel-loader equipment might be applied as many as 360 times an hour. The trial court did not err in denying the motion for a new trial or in allowing Dr. Mark to express his opinion that Estenson's exposure to Caterpillar asbestos-containing products was a substantial factor in causing his mesothelioma.

Motion To Vacate the Verdict

Caterpillar asserts the trial court erred in denying Caterpillar's motion to vacate. Caterpillar contends the jury verdict awarding noneconomic damages more than 10 times the economic damages indicates the verdict is the result of "passion and prejudice." We review a trial court's ruling on whether to vacate a verdict for abuse of

discretion. Schroeder v. Excelsior Mgmt. Grp., LLC, 177 Wn.2d 94, 103, 297 P.3d 677 (2013).

An appellate court may not overturn an award of damages made by a jury unless it is outside the range of substantial evidence in the record, shocks the conscience of the court, or appears to result from passion or prejudice. Bunch v. King County Dep't of Youth Servs., 155 Wn.2d 165, 179, 116 P.3d 381 (2005). The determination of damages is particularly a jury's function, and the court "strongly presumes" the verdict is correct. Bunch, 155 Wn.2d at 179. Other than to inquire whether the substantial evidence test has been met, an appellate court should not concern itself with the amount of damages because "the jury is the final arbiter of the effect of the evidence, for it determines the credibility of the witnesses, the weight of their testimony, and the consequence of all other evidence." Cox v. Charles Wright Acad., Inc., 70 Wn.2d 173, 176-77, 422 P.2d 515 (1967).

Caterpillar relies on Hill v. GTE Directories Sales Corp., 71 Wn. App. 132, 856 P.2d 746 (1993), to argue that when a noneconomic damage award is 10 times greater than the amount of the economic damage award, it is appropriate to suspect that the jury based its award on passion and prejudice. See Hill, 71 Wn. App. at 137-38. However, the Hill court did not engage a ratio-based analysis. See Hill, 71 Wn. App. at 140. Instead, the court gave deference to the discretion of the trial court to decrease a damage award when the award was unsupported by the evidence, and affirmed the remittitur of the award. Hill, 71 Wn. App. at 140. We noted the trial court "was in the better position to make that determination" and accorded the court "room for the exercise of its sound discretion." Hill, 71 Wn. App. at 140.

"Where an award is not contrary to the evidence, this court will not find it to be the result of passion or prejudice based solely on the award amount." Behnke v. Ahrens, 172 Wn. App. 281, 299, 294 P.3d 729 (2012) (citing Brundridge v. Fluor Fed. Servs., Inc., 164 Wn.2d 432, 454, 191 P.3d 879 (2008)). Because substantial evidence supports the jury's verdict, the trial court did not abuse its discretion in denying Caterpillar's motion to vacate the verdict.

We affirm the judgment on the jury verdict.

WE CONCUR: